STEVEN CARBONE,

       Plaintiff,

v.

No. 18-cv-10476-RGS

ANDREW SAUL[1]
in his official capacity as
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

       Defendant.

**REPORT AND RECOMMENDATION ON PLAINTIFF STEVEN CARBONE'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND THE COMMISSIONER'S MOTION TO AFFIRM**

CABELL, U.S.M.J.

## I.  INTRODUCTION

Plaintiff Steven Carbone seeks an order reversing a decision of the Commissioner of the Social Security Administration (the Commissioner) denying his applications for disability insurance benefits (DIB) and supplemental security income (SSI) based on mental (anxiety disorder; bipolar disorder) and physical (sacralization of L5; status post hip replacement) disabilities. The Commissioner in turn seeks an order affirming his decision.[2]

---

[1] The original complaint named Nancy A. Berryhill as the defendant but Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019, and he has thus been automatically substituted in her place pursuant to Fed. R. Civ. P. 25(d).

[2] The parties were ordered to submit formal motions setting out their requests,

The matter has been referred to this court for a Report and Recommendation. (D. 15). As explained below, I recommend that the plaintiff's motion be denied and that the Commissioner's decision be affirmed.

## II. PROCEDURAL HISTORY

On March 31, 2016 and February 19, 2016, the plaintiff submitted applications for DIB and SSI, respectively, alleging a disability as of February 1, 2007. (D. 13, SSA Administrative Record of the proceedings, pg. 258, 267 (R. __)). The SSA denied the applications twice, first on January 10, 2017, and then again on April 13, 2017, following Carbone's request for reconsideration. (R. 190, 198). On October 30, 2017, an administrative law judge (ALJ) found following an administrative hearing that Carbone was not disabled within the meaning of the Social Security Act because he had failed to show a disability at any time after February 1, 2007. (R. 29, 37, 204-205). On January 10, 2018, an Appeals Council denied Carbone's request for review of the ALJ's decision, making that decision the final decision for purposes of this appeal. (R. 1).

---

motions which presumably would then be followed by supporting memoranda. However, in an effort to streamline the briefing process, this court unintentionally directed the parties to forego filing motions and to submit only a joint legal memorandum. (D. 20). The court will therefore treat the joint memorandum as including a motion for the relief that each party requests therein.

## III. FACTS

The court has adopted the parties' agreed-upon statement of facts and sets them forth here with minor non-substantive edits. (D. 22).

### Mental Health Impairments

Carbone suffers from anxiety, bipolar disorder, and a history of alcohol abuse. (R. 16). He was brought to the emergency room on January 17, 2011 for acute, chronic alcohol abuse and suicidal ideation. (R. 393-95). On January 17, 2011, Stephen Blais, LMHC, assessed a Global Assessment of Functioning (GAF) score of 45. (R. 475). A GAF score of 45 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 34 (4th ed. 2000). The next month, he was admitted to Spectrum Health for five days for detoxification from alcohol. (R. 375-87).

On April 1, 2011, Stuart Carter, Ed.D., Ph.D., conducted a psychological consultative exam for the University of Massachusetts Disability Evaluation Services. (R. 1076-79). The plaintiff reported a history of ADHD as a child and a diagnosis of bipolar disorder approximately four or five years prior to Dr. Carter's examination. (R. 1076). He also reported that he had not bathed or shaved for days, that he had difficulty sleeping, that he gets anxious in stores, and that he isolates himself because he says "stupid stuff" when out in public. (R. 1078-79).

He also reported that he was "a Facebook junkie" and would talk to people on the computer. (R. 1078). He further reported having a girlfriend, playing the guitar, and watching TV. (Id.)

Dr. Carter administered a Folstein Mini-Mental Status Exam on which Carbone scored 27 out of a possible 30 points, suggesting no cognitive impairment.[3] (R. 1079). He was able to remember three objects at 30 minutes with interference, spell "world" forward and backward, and subtract serial sevens correctly down to 72. (Id.) Dr. Carter observed that Carbone had racing thoughts, but that they were not disorganized. (R. 1079). Dr. Carter reported his insight and judgment were fair. (Id.) Dr. Carter diagnosed him with bipolar disorder, mixed type, chronic and severe (rapid cycling); panic disorder without agoraphobia; and alcohol abuse, episodic. (Id.). Dr. Carter assessed a GAF score of 32, indicating some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. (R. 1079, DSM-IV).

In April 2013, treating physician Margarita Castro-Zarraga examined the plaintiff for the first time (R. 1017), and completed

---

[3] The mini mental status exam screens for cognitive impairments, assesses the severity of an impairment, and monitors changes by serial testing. Ridha B, Rossor M., The Mini Mental State Examination, Practical Neurology 2005; 5:298, https://pn.bmj.com/content/practneurol/5/5/298.full.pdf. A score between 24-30 indicates no cognitive impairment, a score of 18-23 shows a mild cognitive impairment, and a score of 0-17 shows a severe cognitive impairment. https://pdfs.semanticscholar.org/4370/72f1421146674eaf98e11cc9079311f23fcb.pdf.

a Disability Evaluation Services Medical Report. (R. 1012-20). Dr. Castro-Zarraga reported clinical signs and symptoms including sleep disturbance, anxiety, and depressed mood, most days. (R. 1017). She noted that his affect was depressed and constricted and that he had poor short-term memory. (Id.). She also reported that Carbone was unable to go outdoors or manage conflict due to agoraphobia and bipolar disorder. (R. 1019). Dr. Castro-Zarraga opined that his impairments interfered with his ability to perform some of his activities of daily living (ADLs) such as personal hygiene (deciding to shower on some days), ordinary housework (no interest or drive), and food shopping (needed a companion for his anxiety in open spaces). (Id.). Dr. Castro-Zarraga opined that Carbone has physical, mental health, or cognitive impairments affecting his ability to work, and the impairments are expected to last more than a year. (R. 1020). She reached a similar conclusion in April 2014, as did RNCS Sheila Wells in April 2014 and family practitioner Jonathan Yoder, M.D. in April 2015 and in May 2016. (R. 884, 970, 978, 1102).

In July 2013, Dr. Carter conducted a second psychological evaluation. (R. 991-96). Carbone described having panic attacks three or four times a week. (R. 991). He also stated that he had three psychiatric hospitalizations at Leominster Hospital over the past two years for suicidal ideation. (R. 992). He reported he could still perform his ADLs, but when he was depressed, he would

not bother to shower. (R. 993). As part of the mental status exam, Dr. Carter noted his speech was clear and goal directed, but that the plaintiff needed questions repeated at times in order to elicit a response. (R. 994). Dr. Carter opined, "On the basis of his conversation, I would say his thoughts are slowed down by the depression and maybe all the medicine and perhaps he has low average IQ to average IQ tests but his thoughts are slow." (Id.). He reported poor short-term memory but remembered two of three objects at about fifteen or twenty minutes. (Id.).

Carbone scored 24 out of 30 on the Folstein mini mental status exam. (Id.). He could read, write, and repeat a simple proverb. (Id.). He spelled "world" forward and backward correctly and only subtracted serial sevens correctly once. (Id.). If Dr. Carter had included Carbone's score on the "serial sevens" portion of the test, the Folstein score would have been only 20. (Id.). His affect was quite flat. (Id.). Dr. Carter assessed Carbone's judgment and insight as fair. (Id.). Dr. Carter stated, "[H]e does seem to me at this particular point to have the depressed type of bipolar. He also has quite involved panic attacks with classic symptoms." (R. 995).

Dr. Carter further stated, "[Carbone] is quite immobilized by the depression particularly. I do not see him as doing any productive behavior with supervision and a timeline for money any time soon. He does not relate to people very well. He is quite

slow in his movements, does not take a shower, and does not seem able to function at a very high level despite the fact the he worked for about 6-7 years in the past." (Id.). Dr. Carter noted that the plaintiff was not taking any mood stabilizers at that time. (Id.) At this exam, Dr. Carter diagnosed him with bipolar disorder, severe, depressed type and panic disorder without agoraphobia, moderate to severe. (Id.). Dr. Carter assessed a GAF score of 50 (serious symptoms). (R. 996, DSM-IV).

In April 2014, Sheila Wells, RNCS, also completed a Disability Evaluation Services Medical Report and observed that Carbone looked depressed, his affect was blunted, and he had slow movements. (R. 975). Ms. Wells reported his speech, thought process, and thought content were all within normal limits. (Id.). She also noted that he could not concentrate or focus and that he had a long-term impairment. (Id.).

In June 2014, Carbone was diagnosed with a mood disorder, NOS. (R. 759). He was restarted on Abilify after experiencing a rage episode. (R. 759). Subsequent visits to Social Solutions showed he was playing guitar again, had reduced anxiety, and reported feeling better with medication. (R. 761, 766-74). A Brief Psychiatric Rating Scale completed on June 5, 2014 showed he reported extremely severe anxiety, extremely severe hostility, extremely severe elevated mood, moderately severe depression, and moderately severe self-neglect. (R. 781). In December 2014, a

clinician at Touch Point reported that "[Carbone's] current symptoms include severe anxiety which restrict his going out and depression which consists of low energy, low motivation and sleeping a lot. Overall he is stable at this time." (R. 793). The clinician assessed a GAF of 55 indicating moderate symptoms or moderate difficulties in social, occupational, or school functioning. (Id., DSM-IV). On June 10, 2015, Carbone rated his anxiety as moderately severe and his depression as moderate. (R. 789).

Dr. Carter conducted his third psychological examination on August 14, 2015. (R. 1113-17). Carbone reported that he was doing about the same as he had been when he last saw Dr. Carter in 2013. (R. 1113). He also reported he caught his girlfriend cheating and stated he was still very depressed about that. (Id.) Carbone reported he was able to go shopping at the beginning of the month, early in the day before anyone else was there. (R. 1114). Dr. Carter reported that Carbone's speech was quite simplistic, but he could convey information. (R. 1115). "[H]e seems to have low average or borderline IQ with a learning disability." (Id.). His affect was flat, and judgment and insight were fair. (Id.).

"On the Folstein, he scored 20/30 with 1 of 3 objects remembered. He was not able to spell "world" in reverse order. He only subtracted serial sevens correctly one time. He did remember a little phrase but says he cannot read because he does

not have glasses." (Id.). Dr. Carter opined, "Right now, Steve is not able to learn new tasks with ordinary training . . . He is socially withdrawn. He has marked problems in attention span and concentration, and I do not think he can adapt to any work-like tasks presently such as show up on time, complete a task within a normal timeframe, respond to supervision, etc. He certainly would not be able to take any criticism." (R. 1115-16). Dr. Carter affirmed his previous diagnoses of bipolar disorder and panic disorder and assessed a GAF score of 54 (moderate symptoms). (R. 1116, DSM-IV).

On April 21, 2015, Jonathan Yoder, M.D., Carbone's primary care physician, completed a Disability Evaluation Services examination and report. (R. 1094-1101). He noted that Carbone was treated for a suicide attempt in 2008 or 2009 at Health Alliance Hospital. (R. 1099). Dr. Yoder reported that Carbone's clinical signs and symptoms included sudden mood changes, severe depression/anhedonia, and occasional anxiety/panic attacks. (Id.). His thought content included social anxiety and fear, but otherwise he had normal, appropriate functioning. (Id.) Dr. Yoder stated that Carbone's symptoms "are generally well controlled on medications" and that Carbone's social anxiety impacts his ability to shop for food and interact with family and/or friends. (R. 1099, 1101).

In August 2015, Victoria Haskell, LMHC, reported that Carbone was in sustained remission from alcohol abuse. (R. 488). She further reported that his symptoms included fatigue, difficulty concentrating, difficulty sleeping, racing thoughts, "selective" hearing, and spacing out. (R. 488). In September 2015, Ms. Haskell listed the diagnoses of bipolar II disorder and alcohol dependence in remission. (R. 643).

In November 2015, Carbone was once again seen in an emergency room for suicidal ideation in the context of recurrence of alcohol abuse and psychosocial stressors. (R. 444). He was hospitalized for six days at Bournewood Hospital. (R. 444-49). At the time of discharge, he denied any depressed mood, manic symptoms, or cravings to drink. (R. 446).

From June 2016 through May 2017, Carbone saw Dr. Massey for medication management for depression, anxiety, and aggression and Ms. Haskell for counseling. (R. 460-62 (June 2016), 1142-80 (July 2016 to February 2017), 1190-1238 (August 2016 to May 2017)). In March 2016 Ms. Haskell wrote, "His mood varies much from day to day, and we tend to see typical depressive symptoms emerging especially when there are stressors in his life. He has been stable for several months, but his living situation continues to be a problem." (R. 452).

In August 2016, Ms. Haskell completed a Mental Health Impairment Questionnaire. (R. 847-52). She noted that Carbone

has a negative attitude, irritability, low energy, and short-term memory deficits. (R. 848). All other functioning was within normal limits. (Id.) She reported a GAF score of 50 (serious symptoms). (R. 847, DSM-IV). She opined that Carbone has

> some difficulty comprehending instructions, details of language, discernment of fine points. Client does not understand "big words" . . . Client has limited amount of patience, cannot stay focused, forgets steps, becomes frustrated and gives up . . . Client has little ability to interact with others, he becomes irritated easily, snaps at people, gets in arguments. Fired/let go from several jobs . . . Client is not good at following rules & directions, more independent minded, little patience. Low comprehension of novel situations.

(R. 851).

Dr. Carter conducted his fourth psychological evaluation of the plaintiff on August 26, 2016. (R. 855-59).[4] Dr. Carter noted that he recognized Carbone immediately, and Carbone remembered the approach used by Dr. Carter. (R. 855-56). Carbone reported he continued to live with his ex-girlfriend. (R. 857). He reported he could cook, perform his ADLs, and shop at a time when no one is there. (Id.). Dr. Carter observed that Carbone's speech was "run-on and very intense in staccato-like fashion; rat tat tat and fast, but not forced." (Id.). He further observed that Carbone seems to have about low-average to average intelligence and racing

---

[4] Page 5 of 7 is missing from Dr. Carter's 2016 report in the record before this court, as shown by the page numbers in the upper left-hand corner. (R. 855-60). The exhibit mark in the upper right-hand corner notes that there are 7 pages to this exhibit. (R. 855). The ALJ's decision confirmed there were 8 pages. (R. 35). Accordingly, the parties attached the missing page to their joint memorandum as Exhibit A and the court refers to it as such here.

thoughts. (R. 858). His affect was quite animated and profane. (Id.). He scored 27/30 on the Folstein. (Id.). Dr. Carter did not see any significant memory problems as Carbone could remember three out of three objects at fifteen minutes with interference. (Id.). Carbone spelled "world" in reverse order, read, repeated a simple little phrase, and subtracted serial sevens one time. (Id.). Dr. Carter observed that Carbone "seemed a little bit manic, as opposed to anxious during our interview." (Id.). He, therefore, opined, "[I]t seems to me that all the profanity, the mood swings, and the rapid speech is more related to a bipolar illness." (Id.). Dr. Carter reported he referred Carbone to Mass Rehab because he appeared to have some talent. (Exhibit A).

Dr. Carter observed that he did not perceive Carbone "to be much different" from when he had seen him previously. (R. 855). Dr. Carter reported,

> [H]e has really accepted the victim and out of work role that so many people in his age group unfortunately get into even after a long work history, and he does not seem interested in learning any new tasks or even trying to do any adaptive functioning in a competitive work-like environment. In terms of getting along with people, he seems a bit short tempered . . . I would say there is some attention span and concentration problems because of an interaction effect between his psychiatric symptoms, but I cannot judge the extent to which these exist.

(Exhibit A). Dr. Carter assessed a GAF score of 57 (moderate symptoms). (R. 859, DSM-IV).

In February 2017, Ms. Haskell noted no significant changes in Carbone's medical condition. (R. 1179-80). She reported, "Little progress on making use of social supports or behavioral solutions." (R. 1180). In May 2017, Ms. Haskell reiterated her March 2016 statement and added that the plaintiff had experienced some panic attacks. (R. 1189).

### State Agency Consultants' Opinions

In October 2016, State agency psychological consultant Lois Condie, Ph.D., assessed the "paragraph B" criteria that were in effect prior to January 17, 2017. She opined that Carbone has mild restrictions in ADLs; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence or pace; and one or two episodes of decompensation. (R. 119). Dr. Condie further opined that Carbone is able to maintain attention, concentration, persistence, and pace for routine tasks, for two hours at a time, over a normal workday/week, with normal supervision and tolerate the minimum social demands of a simple task setting. (R. 123, 124).

In January 2017, State agency medical consultant Alice Truong, M.D., opined that Carbone could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday. (R. 121). Additionally, Carbone can never climb ladders, ropes or scaffolds, but can occasionally

13

perform other postural activities. (R. 122). At the reconsideration stage, S. Ram Upadhyay, M.D., opined to the same limitations in Dr. Truong's assessment, except that he added that Carbone must avoid concentrated exposure to hazards. (R. 159-61).

In April 2017, State agency psychological consultant Joan Kellerman, Ph.D., assessed the current "paragraph B" criteria. (R. 157). She found that Carbone's ability to understand, remember, or apply information is mildly impaired; his ability to interact with others is moderately impaired; his ability to concentrate, persist, or maintain pace is moderately impaired; and his ability to adapt or manage himself is mildly impaired. (Id.). Dr. Kellerman, and the State agency psychologist at the initial stage, Louis Condie, Ph.D., both assessed a mental residual functional capacity that Carbone was able to maintain attention, concentration, persistence, and pace for routine tasks, for two hours at a time, over a normal workday/week, with normal supervision and he was able to tolerate the minimum social demands of a simple-task setting. (R. 122-24, 161-63). Dr. Kellerman's assessment is for the period February 1, 2007 to April 6, 2017. (R. 161-63).

**Medical Expert's Testimony**

At the September 2017 administrative hearing before the ALJ, medical expert Gerald Koocher, Ph.D., testified that Carbone meets the standards for Part A of listing 12.04 (depressive, bipolar and

14

related disorders) and possibly for 12.06 (anxiety and obsessive-compulsive disorders). (R. 53). He further opined that Carbone has no more than moderate limitations in the ability to understand, remember, and apply information; interact with others; concentrate, persist, and maintain pace; and adapt or manage himself. (Id.). Dr. Koocher testified that Dr. Carter's August 2016 report "was actually most useful" to him as he developed his own opinion because Dr. Carter's report "has some good details of the Claimant's functioning." (R. 52). He noted that Dr. Carter's report assigned a GAF score of 57, which is the upper end of the moderate range. (R. 53).

Dr. Koocher affirmed that GAF scores in the range from 45 to 57 "would put us kind of on a cusp of the range from relatively significant symptoms to kind of somewhat less severe symptoms." (R. 63). Dr. Koocher testified the severity of Carbone's bipolar symptoms waxed and waned over time which was common with this impairment. (R. 64). When questioned by counsel, he estimated that in a universe of 100 patients with bipolar disorder, one-third might have alcohol and substance abuse problems. (R. 64-65).

Dr. Koocher further testified that he had "no clue how to answer" a question about whether Carbone would have difficulty recognizing and correcting a mistake in a work setting. (R. 65). He also testified that when Carbone's bipolar symptoms were

controlled with medication, he would be better able to function. (R. 67). Dr. Koocher testified the ALJ "will have to weigh the physical conditions and the complications associated with pain or other disabilities that combined with the mental stability in some way, to make a determination.". (R. 53). Dr. Koocher processed the case from a psychological point of view. (Id.). He did indicate that Carbone's functional ability could be further restricted if chronic pain was considered in combination with his bipolar and anxiety disorders, "[s]o, His Honor has to take all of that into consideration." (R. 66-67).

## IV. THE ALJ'S FINDINGS

On October 30, 2017, the ALJ found that the plaintiff was not disabled. (R. 29). The ALJ applied the mandated five-step process in reaching this determination.

Step one considers whether the plaintiff is engaged in substantial gainful activity ("SGA"), because a claimant who is so engaged is not disabled. 20 C.F.R. § 404.1520(b). SGA is defined as work activity done for pay that involves performing significant physical or mental activity. 20 C.F.R. §§ 404.1572(a)-(b). The ALJ found that the plaintiff had not engaged in SGA since the alleged onset date of his disability, February 1, 2007. (R. 16).

Step two considers whether the plaintiff has a medically determinable impairment that is severe, or a combination of impairments that is severe as defined by the pertinent regulations.

20 C.F.R. § 404.1520(c). A plaintiff who does not have an impairment that is severe is not disabled. Here, the ALJ found that the plaintiff suffered from sacralization of L5;[5] status post hip replacement; anxiety; bipolar disorder; obstructive sleep apnea; and alcohol history, in sustained remission. (R. 16). The ALJ reached this conclusion after determining that the impairments "impose more than minimal limitations." (Id.).

Step three considers whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 416.920(d), 416.925, and 416.926. If so, the claimant is conclusively presumed to be disabled. If not, one moves to the next step. The ALJ found here that the plaintiff's impairments did not meet or medically equal the severity criteria of an impairment listed in the pertinent regulations. (R. 16). The ALJ explained that the plaintiff's physical and mental impairments did not reach the level of severity contemplated by the pertinent regulations. (Id.). The ALJ noted that the plaintiff only had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or

---

[5] Sacralization refers to an "anomalous fusion of the fifth lumbar vertebra with the first segment of the sacrum." Sacralization, THE FREE DICTIONARY, https://medical-dictionary.thefreedictionary.com/sacralization (last visited Aug. 14, 2019).

managing oneself. (R. 19).

The ALJ accordingly went on to step four, which considers the claimant's residual functional capacity ("RFC") to work. This step entails a two-part inquiry. The ALJ first determines the claimant's RFC to work at all, that is, his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 416.920(e). The ALJ then determines whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. § 416.920(f). If the claimant has the RFC to do his past relevant work, he is not disabled. However, if the claimant is not able do any past relevant work, the analysis proceeds to the fifth and last step, which entails asking whether there are any jobs in the national economy the claimant is capable of performing.

The ALJ found at the first stage of step four that Carbone did have the RFC to perform light work, albeit with some limitations:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to lifting up to 20 pounds, frequently lifting 10 pounds, and walking and standing 6 to 8 hours. The claimant would need to alternate sitting and standing, as needed. He is limited to no more than occasional climbing, stooping, balancing, kneeling, and crawling. The claimant is limited to simple, routine, repetitive tasks, which require concentration for 2 hour time periods. He is limited to work requiring no more than occasional interaction with the general public and no

more than occasional interaction with co-workers. (R. 20). In reaching this determination, the ALJ found that, while the plaintiff's medically determinable impairments could reasonably be expected to cause the plaintiff's claimed symptoms, the plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence in the record. (R. 21). The ALJ explained that the objective medical evidence did not support the plaintiff's allegations of disabling physical and mental impairments. (R. 26-27).[6] The ALJ noted evidence in the record indicating that the plaintiff performs ADLs, uses the computer, and plays guitar, sometimes before crowds. (R. 21). The ALJ also summarized the medical evidence, including, in relevant part, Dr. Carter's 2011, 2013, 2015, and 2016 opinions; the State agency consultants' opinions; and Dr. Koocher's hearing testimony. (R. 21-26).[7]

The ALJ gave significant weight to the opinion of the impartial medical expert, Dr. Koocher, after carefully considering the plaintiff's objection to his testimony. (R. 26). The ALJ found Dr. Koocher's testimony to be reliable and agreed with the

---

[6] The plaintiff does not challenge the ALJ's findings with respect to his physical pain. The court therefore focuses here on the medical evidence and the ALJ's findings regarding the plaintiff's anxiety and bipolar disorder.

[7] As the parties provided descriptions of this evidence in great detail and the court has adopted them above, the court need not reiterate them here.

testimony. (Id.). The ALJ also gave great weight to Dr. Carter's 2016 opinion, noting that as a consulting examiner, he "has an understanding of social security disability programs and evidentiary requirements." (Id.).

The ALJ gave partial weight to the opinions of the State agency psychological consultants, Drs. Condie and Kellerman, "because other medical opinions were more consistent with the record as a whole." (Id.). The ALJ also noted that the State agency consultants "did not adequately consider the [plaintiff's] subjective complaints." (Id.).

The ALJ found at the second part of the inquiry that Carbone was unable to perform any past relevant work. (R. 20).

The ALJ therefore moved to step five, which asks whether there are any jobs in the national economy the claimant is capable of performing given his RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. (R. 27-29). Based on the record and a vocational expert's testimony, the ALJ found that the plaintiff "is capable of making a successful adjustment to other work" such as inspector, bench assembler, and hand packager, and that these positions existed in significant numbers in the national economy. (Id.).

The ALJ accordingly concluded that the plaintiff was not disabled. (R. 29).

# V.   Standard of Review

A court reviews the findings of an ALJ only to determine whether the findings are supported by substantial evidence, and whether the correct legal standard was applied. *Teague v. Colvin*, 151 F. Supp. 3d 1, 2 (D. Mass. 2015). Substantial evidence to support a decision exists if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Id.* This court must keep in mind when applying this standard of review that it is the role of the ALJ, and not this court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence. *Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). This court may affirm, modify, or reverse the ALJ's decision, but reversal is only warranted if the ALJ made a legal or factual error in evaluating the plaintiff's claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman–Roman v. Comm'r of Soc. Sec.*, 114 Fed. Appx. 410, 411 (1st Cir. 2004). This court therefore must affirm the ALJ's decision if it is supported by substantial weight, even if the record could arguably support a different conclusion. *Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).

# VI.   Analysis

As noted above, the ALJ found at step four that Carbone

retained the RFC to do some lighter work even though he lacked the capacity to do his past relevant work, and went on to find at step five that he was not disabled because there were jobs in the national economy that he could perform. Carbone contends that the ALJ erred in determining his RFC and advances several arguments in support.

He argues first that the ALJ failed to properly consider the 2011, 2013, and 2015 medical opinions of Dr. Carter, who among other things opined that the plaintiff had a number of functional limitations due to his mental impairments. He argues next that several pieces of evidence the ALJ relied upon each failed to support the ALJ's decision, including (i) Dr. Carter's 2016 opinion, (ii) Dr. Koocher's testimony, and (iii) the State agency consultants' opinions. Finally, he argues that, assuming the ALJ did err as he contends, it means the ALJ could not rely on the vocational expert's testimony for his determination at step five. As discussed below, the court does not find these arguments persuasive and finds no basis to conclude that the ALJ erred in making his RFC determination.

### *The ALJ Properly Considered the Opinion Evidence*

The plaintiff argues that the ALJ failed his obligation to consider all of the opinion evidence in the record. He argues in particular that the ALJ accorded great weight to Dr. Carter's 2016 report but disregarded the opinions Dr. Carter rendered in his

2011, 2013 and 2015 reports. This matters, Carbone contends, because these three prior reports "contained more specific functional limitations based on clinical interviews and objective testing" than the 2016 report. Carbone argues that the ALJ's failure to explain why he disregarded the "more explicit" opinions is error requiring remand, particularly where Dr. Carter stated in 2016 that he did not perceive Carbone to be much different from when he saw him previously.

To the extent Carbone argues simply that the ALJ failed to consider all of Dr. Carter's reports, the argument is directly belied by the record. An ALJ must "always consider the medical opinions in [the] case record," see 20 C.F.R. § 416.927(b), but the record shows the ALJ did just that. As it relates specifically to Dr. Carter, the ALJ specifically summarized each of Dr. Carter's four reports/opinions in his decision, leaving no doubt that he considered them in determining the plaintiff's RFC. (R. 23-25). It is true that the ALJ stated only that he gave "great weight" to Dr. Carter's 2016 opinion, but that does not mean, as the plaintiff appears to argue, that he disregarded the earlier opinions, and the record demonstrates in any event that he satisfied his obligation to consider them.

More generally, the ALJ devoted more than a third of his decision to discussing the various medical evidence in the record including, all four of Dr. Carter's opinions, Dr. Koocher's

testimony, and the opinions of the State agency consultants, as well as many others noted above who opined on various other impairments of the plaintiff's. Accordingly, there is no basis to find that the ALJ failed to consider Dr. Carter's prior reports or the other pertinent opinion evidence in the record.

To be sure, the plaintiff's brief may also be read to argue that, assuming the ALJ did consider the pre-2016 reports, remand is still appropriate because the ALJ failed to explain what weight he accorded the reports, if any. Assuming he advances that argument, the court agrees that the ALJ could have, and perhaps should have said more about Dr. Carter's reports, but his failure to do so here does not constitute reversible error warranting remand.

First, it is worth noting that the ALJ was not required to give controlling weight to any of Dr. Carter's opinions where Dr. Carter was a "consulting examiner" rather than a treating source. *See* 20 C.F.R. §§ 404.1527(a)(2), (c)(2); *see also Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994) (opinion of consulting physician not entitled to same deference as that of treating physician); *Turberville v. Colvin,* No. 1:11-CV-262, 2014 WL 1671582 at *6 (M.D. North Carolina April 23, 2014) (ALJ had no obligation to give decisive weight to opinion of consulting examiner).

Moreover, notwithstanding the plaintiff's assertion that Dr.

Carter's prior reports "contained more specific functional limitations" than did his 2016 report, this court does not readily agree with that characterization. The 2016 report, which also alluded to the plaintiff's past meetings with Dr. Carter, was the most contemporaneous and up to date report issued by Dr. Carter, and it contained ample observations and opinions bearing on the plaintiff's limitations. It among other things reflected Carbone's opinion that his anxiety and pain symptoms had remained the same for about the last five years, and reflected Dr. Carter's opinion that Carbone was bipolar, had PTSD and panic symptoms, "had accepted the victim and out of work role," did "not seem interested in learning any new tasks or even trying to do any adaptive functioning in a competitive work-like environment," seemed "short tempered," and had "some attention span and concentration problems because of an interaction effect between his psychiatric symptoms."

In the court's view, these observations from Dr. Carter's 2016 report are not meaningfully dissimilar to those contained in his prior reports, even if the verbiage and rhetoric in those earlier reports at times arguably expressed his thoughts more starkly. Carbone notes, for example, that Dr. Carter's 2013 report opined that he did not see Carbone as being able to do any time soon "any productive behavior with supervision," and his 2015 report opined that he was "socially withdrawn," "not able to learn

new tasks with ordinary training," had "marked problems in attention span and concentration," and probably could not show up to work or complete an assignment on time, or "respond to supervision." Those opinions, to this court, are quite similar in spirit to those noted above in Dr. Carter's 2016 report, namely that Carbone "had accepted the victim and out of work role," did "not seem interested in learning any new tasks or even trying to do any adaptive functioning in a competitive work-like environment," and had "some attention span and concentration problems."

Moreover, and as the Commissioner notes, the ALJ essentially incorporated the functional limitations suggested by the collective opinions into his RFC assessment where he stated that Carbone would need to be "limited to simple, routine, repetitive tasks" limited to two-hour time periods and "work requiring no more than occasional interaction with the general public and no more than occasional interaction with co-workers." (R. 20).

In sum, the record reflects unambiguously that the ALJ satisfied his obligation to consider all the opinion evidence in the record, including Dr. Carter's four reports. While the record does not reflect what weight the ALJ assigned to Dr. Carter's earlier reports, that deficiency does not require remand here where the ALJ's RFC assessment nonetheless incorporated the limitations opined in the reports.

*Substantial Evidence Supported the ALJ's Decision*

Carbone also challenges the ALJ's reliance on specific pieces of evidence.  He argues first that Dr. Carter's 2016 report does not by itself provide substantial evidence in support of the ALJ's decision.  Carbone appears to base this argument on the flawed premise addressed and rejected above, that the ALJ failed to credit Dr. Carter's "far more restrictive 2011, 2013 and 2015 opinions."  The argument thus goes nowhere where the record reflects that the ALJ considered the reports and incorporated the limitations suggested by those reports into his RFC assessment.

Moreover, even assuming *arguendo* that Dr. Carter's 2016 report (or any other single piece of evidence) failed by itself to support the ALJ's overall determination, the plaintiff's argument misapprehends the relevant inquiry, which is not whether a particular piece of evidence standing alone did or did not support the ALJ's decision, but whether the ALJ's determination was supported by substantial evidence in the record as a whole.  *Teague v. Colvin*, 151 F. Supp. 3d 1, 2 (D. Mass. 2015).  Without reciting again here the litany of evidence the ALJ considered, and particularly where Carbone does not actually brief the issue or make the claim that the evidence as a whole failed to support the ALJ's determination, the court is persuaded from its review of the record and the ALJ's detailed summary that substantial evidence in the record as a whole supported the ALJ's RFC assessment that

Carbone could perform light work limited to simple, routine, repetitive tasks requiring concentration for no more than two hours at a time, and with no more than occasional interaction with the general public or co-workers.

Carbone's challenge to the ALJ's reliance on Dr. Koocher's testimony fails as well. Dr. Koocher, whose testimony the ALJ gave great weight, considered the plaintiff's impairments under Listing 12.04 and 12.06, and also considered each of the four "paragraph B" criteria. He testified that the plaintiff was no more than moderately impaired in understanding, remembering and applying information, in his ability to interact with others, and in his concentration, persistence and pace. Dr. Koocher also stated that the ALJ would need to weigh the physical conditions and any complications with pain or other disabilities that combine with the plaintiff's mental stability. On cross examination, Carbone's counsel questioned Dr. Koocher about Dr. Carter's other reports. However, those reports were dispersed in a large exhibit and Dr. Koocher asked for more specific information to answer the question. The ALJ instructed Carbone's counsel to provide a specific page reference and Dr. Koocher was able following the clarification to testify that he had read Dr. Carter's reports. (R. 61-63).

Against that backdrop, the plaintiff contends that Dr. Koocher's opinion does not provide substantial evidence to support

the ALJ's determination because (1) he did not address Dr. Carter's first three opinions, (2) he was unable to adequately assess the "paragraph B" criteria, and (3) he acknowledged that there would be greater limitations due to Carbone's chronic pain that were not accounted for in his assessment.

With respect to the first claim, the plaintiff argues that Dr. Koocher acknowledged on cross-examination that he did not read all of Dr. Carter's reports. However, the court's own review of the transcript shows that while there initially was some confusion when Carbone's counsel cross-examined Dr. Koocher about Dr. Carter's other reports, Dr. Koocher asked for clarification and once provided with a specific page reference testified that he did in fact review Dr. Carter's other reports. This claim does not merit further attention.

The plaintiff argues next that that Dr. Koocher was an unreliable witness because he testified that he could not answer certain questions, and qualified his answers to others regarding "paragraph B." However, as a non-examining consultant, Dr. Koocher relied on Carbone's treatment records in providing his opinion. In the court's view, Dr. Koocher answered the cross-examination questions regarding "paragraph B" limitations based on the evidence in the record. Where Dr. Koocher testified that he was unable to answer a question on a specific limitation, it is clear to this court that the evidence in the record did not give him a

basis to answer such a question. In any event, it is for the ALJ, and not the court, to determine the credibility or reliability of witnesses. *Ortiz*, 955 F.2d at 769.

Finally, the plaintiff contends that the ALJ erred in relying on Dr. Koocher's testimony because he only testified about limitations stemming from Carbone's mental impairments and did not account for limitations due to his chronic pain. This argument fails because Dr. Koocher was a psychological consultant and thus could only opine on Carbone's mental impairments. There is also no evidence in the record to suggest that the plaintiff's mental impairments caused his alleged chronic pain.

In short, the ALJ did not err in overruling the plaintiff's objection to Dr. Koocher's testimony and in giving it significant weight.

### *The State Agency Consultants' Evidence was Reliable*

The ALJ gave partial weight to the State agency medical consultants' mental assessments of Drs. Condie and Kellerman because other medical opinion evidence was more consistent with the record as a whole, and because the consultants did not adequately consider the plaintiff's subjective complaints. Carbone challenges the ALJ's reliance on their opinions and appears to advance three arguments in support.

He argues as an initial matter that the consultants' evidence cannot constitute "substantial evidence in support of the ALJ's

decision" where the ALJ only accorded the evidence partial weight. To the extent the plaintiff by this argues that an ALJ may not rely on evidence where he has assigned only partial weight to it, the contention is unfounded because an ALJ must consider the evidence in the record and may accord each piece whatever weight he believes is appropriate. *See e.g., Moseley v. Peabody Coal Co.*, 769 F.2d 357, 360 (6th Cir. 1985) (determinations of the weight to be accorded to the evidence is left to the ALJ). To the extent the plaintiff argues somewhat differently that evidence as a matter of logic cannot be "substantial" where it is only accorded partial weight, the argument fails because the relevant inquiry is whether there is substantial evidence in the record *as a whole* to support the ALJ's decision. As discussed above, here, there is.

The plaintiff also argues that Dr. Condie's opinion is irrelevant because she assessed the plaintiff's application prior to January 17, 2017 using the old "paragraph B" criteria. Dr. Condie opined that the plaintiff had mild limitations in two categories, including in understanding, remembering or applying information, and in adapting or managing oneself. She also opined that the plaintiff experienced moderate limitations in the other two categories, including interacting with others and in concentration, persistence or maintaining pace. Based in part on this evidence, the ALJ found that the plaintiff experienced moderate limitations in all four areas, consistent with Dr.

Koocher's testimony.

There was nothing improper about the ALJ's consideration of this evidence. Under Social Security regulations, the assessment of the "paragraph B" criteria is properly performed by the ALJ, not by a physician. 20 C.F.R. §§ 404.1520a, 416.920a; *see Jayne-Chandler v. Comm'r of Soc. Sec. Admin.*, Civil No. 18-cv-606-JL, 2019 WL 3543717, at *4 (D.N.H. Aug. 5, 2019). There are significant areas of overlap between the new and old "paragraph B" criteria, such that an evaluation under the old criteria would inform and assist in an evaluation under the new criteria. *Montgomery v. Comm'r of Soc. Sec.*, Civil Action No. 3:17-CV-00617-CHL, 2019 WL 1427560, at *7 (W.D. Ky. Mar. 29, 2019). Given the overlap, it was not error to consider Dr. Condie's opinion under the old criteria.

Finally, the plaintiff contends that Dr. Kellerman's opinion evidence was not reliable because she did not review the full record. The plaintiff bases this claim on the fact that Dr. Kellerman only explicitly referenced Dr. Carter's 2016 report in her opinion, suggesting by inference that she therefore must not have read the prior reports. The court declines to endorse this argument where there is no evidence in the record to support the plaintiff's assertion. But, even if Dr. Kellerman did not review Dr. Carter's earlier reports, it is clear that the ALJ did review them, and he moreover only accorded Dr. Kellerman's opinion partial

weight and relied on it to the extent it was consistent with the record as a whole. No discernible error flowed from the ALJ's consideration of this evidence.

In sum, this court discerns no error in the ALJ's consideration and weighing of the evidence or, subsequently, his determination regarding the plaintiff's RFC. Consequently, it is not necessary to consider the plaintiff's remaining derivative arguments that the ALJ, having failed to consider all the evidence, must have thus relied on his own lay assessment of raw medical data, or that the vocational expert's testimony at step five was based on an erroneous RFC.

## VII. CONCLUSION

For the foregoing reasons, it is respectfully recommended that the plaintiff's motion to reverse the decision of the Commissioner be DENIED and the Commissioner's decision be AFFIRMED.[8]

---

[8] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED: August 29, 2019